DEPOSIT TRUST & SAVINGS BANK, AS TRUSTEE OF THE
GOODS, CHATTELS AND PROPERTY OF WILLIAM
E. HAUERT, DECEASED v. JENNIE HAUERT ·
AND OTHERS.[1]

July 28, 1922.

Nos. 22,908, 22,909.

Evidence that no trust was created authorizing disposal of property after
death.

It is the claim of plaintiff that deceased and her husband during
lifetime of both gave over certain property in trust for certain pur-
poses and directed also the disposition of the property after the death
of both husband and wife. There is testimony to that effect and it is
not directly contradicted. Facts and circumstances are, however, dis-
closed by the evidence which sustain a finding made by the trial court
that no trust, authorizing the disposal of the property after death, was
created.

Action in the district court for Winona county to determine
rights in certain trust property. The case was tried before Cal-
laghan, J., who made findings and ordered judgment in favor of
defendant Otto Olson, as administrator of the estate of Anna Hauert,
deceased. The motions of plaintiff and certain defendants to amend
the findings was granted in part and denied in part. From the
judgment entered pursuant to the order for judgment, plaintiff bank
and defendants Jennie Hauert, William Knecht, Edwina Koelmel,
Louisa Knecht, Caroline Neiheisel, Jacob Hauert and Albert Hauert
appealed. Affirmed.

*Tawney, Smith & Tawney* and *Brown, Somsen & Sawyer*, for appel-
lants.

*Theodore Buehler* and *Webber, George & Owen*, for respondents.

[1]Reported in 189 N. W. 599.

HALLAM, J.

William E. Hauert and Anna Hauert, his wife, lived their early life on farms in the Waumandee valley in Buffalo county, Wisconsin. William attended the common schools there. Anna's education was very limited. After their marriage they went from place to place, showing little evidence of prosperity. They had no children. He was, at different times, common laborer, proprietor of a saloon, janitor in a flat building and perhaps followed other avocations. Both were industrious and thrifty. He had bad health. She helped him in his work where she could. Unbeknown to any one they accumulated about $12,000. Most of this was in money deposited in various banks. The evidences of these deposits they kept in a box in their home. Originally most of the deposits were in the name of William E. Hauert, but some years before his death they were transferred to the name of Anna Hauert. Lena Hauert was a sister of William E. Hauert. Through their whole life they sustained very close and confidential relations. Lena was a seamstress, had lived in Winona for more than 30 years, had had some business experience, and was much loved and trusted by William and Anna. In the summer of 1918, William and Anna were living at Buffalo City, Wisconsin. William was suffering from tuberculosis and he sent for Lena to come to him. She came in July. Her testimony is that, while she was at Buffalo City, the following occurred:

William, lying in bed, called her and said:

"Lena, Anna and I have been talking the matter over. We want you to live with us. We have plenty—and you won't have to work any more. Then he said: "Anna, go and get my box and bring it to me." She brought it and put it on the bed and he unlocked it, put on his spectacles; he opened it, took out the books and papers. He said: "Here are all our books and papers, besides what you already have at home, in Winona. Now, in all," he said, "we have twelve thousand dollars; two bank books on the St. Paul State bank. Now, I have a certificate or a draft in St. Paul and I want you to take to Cochrane and two hundred dollars of it (the amount of it

was $361.60), two hundred dollars of that put on deposit, one certificate of deposit two hundred dollars; one hundred fifty in the pass book, and $11.60 you will give to Anna," and I did so. * * * He took the books and showed them to me, handed them to me to look at, and he says "You take these and keep them, and look after Anna; draw the interest; give her all the money she wants to use, and we also have planned—we want a lot in the Waumandee Cemetery near the Catholic Church, and on that lot I want you, with her assistance, to erect a monument as soon as things shape themselves. You have experience in getting monuments, and I know we have trusted to you, Anna and I," and she said "I certainly do, for I haven't had any experience in anything of that kind,"—"the monument not to exceed a thousand dollars. Now, after her death we have planned out where the money should go and what to do, if any." * * * "One thousand to go to you; five hundred to sister Jennie—Will's sister Jennie; five hundred to his nephew, Will Knecht; one thousand to their niece, Lena Fink, and a thousand dollars to the Catholic Church of Waumandee for Masses, and if there is any left after that to be divided equally among his sisters and brothers. Now, Lena, will you do this?" and I said I would.

Her testimony is that Anna was sitting at the bedside at the time and that Anna said: "Lena, you have always been our standby and we want you to do all that Will has said and we trust you."

She testified that thereupon the bank books and certificates of deposit were delivered to her and that she kept them in her possession until after the death of both William and Anna, and in the meantime attended to the collection of the interest and such other business transactions as the instructions of her brother necessitated.

William died intestate August 20, 1918. Anna died intestate April 9, 1920. Defendant Olson was appointed administrator of Anna's estate. Lena resigned as trustee. Plaintiff was appointed by the district court to act in her stead, and plaintiff brought this action, asking the court to adjudge the right and ownership of said property. The court found that plaintiff had no rights therein, and plaintiff and the defendants interested in the alleged trust appeal.

The trial court found that the property was not transferred to Lena in trust, but was simply delivered to her for safe keeping and in order that she might attend to the collection and application of the interest and to the renewal of the certificates. If the finding that there was no trust created is sustained by the evidence, that ends the case. The court expressed the opinion that such a trust may be created by parol and we will assume that to be the law. The question of fact is was there a trust created. It matters little whether the money belonged to William or Anna. Lena's evidence is that both were present and the transaction was as much the transaction of one as the other. The testimony of Lena is direct. There is no direct denial of it. In the nature of things there could not be. It was subject to impeachment by facts and circumstances, but if not impeached it must be taken as true. Hawkins v. Sauby, 48 Minn. 69, 50 N. W. 1015.

The trial court was of the opinion that Lena's testimony was impeached by facts and circumstances. We are of the opinion that, under the evidence, the question whether there was a trust created authorizing the disposal of this property after death was a question of fact, and that the finding that there was not is sustained by the evidence. In considering the sufficiency of the evidence we must, of course, take it in its aspect most favorable to defendant-respondents.

Some of the circumstances militating against Lena's claim of a trust are the following:

She did not reveal this alleged trust agreement to any one for more than five months after the death of Anna. During that time she had an attorney in whom she had confidence, who was acting for her, but she did not reveal it to him. Of her failure to do so she made no satisfactory explanation. During this five months many things happened. There is evidence that right after the death of Anna, when probate of the estate was suggested by one of Anna's brothers, she said: "Oh, I don't think it is any use. How would it be if we divide that up amongst ourselves?" A few days later she went with William Fink, another brother of Anna's, to the judge of probate, and while there she told the judge that Anna had

left about $10,000. There is evidence that she asked the judge who the heirs of Anna would be; that he told her Anna's brothers and sisters would inherit the estate; that she then said that at the time Anna was stricken she was on her way to Winona to make a will making the Hauerts and the Finks, the brothers and sisters of herself and her husband, the beneficiaries, and that she asked Mr. Fink if he would be willing to have the Hauert heirs share equally with the Fink heirs and said if they wouldn't consent to that she was out of it; that at no time during the conference did she make any suggestion of any claim of a trust. She told her attorney of this conference without making any such claim, and, with her knowledge, he endeavored to obtain a settlement along the lines she had suggested.

At the hearing at which the administrator was appointed, she appeared with her attorney. She said nothing then of her claim of a trust.

Anna had discussed with her the making of a will and Lena had consulted with her attorney as to that. Her explanation of this was that Anna wanted "to make it secure as it had been arranged."

After his appointment, the administrator called on her and asked for the papers in her possession. She made no claim to them and told him her attorney would deliver them over. She authorized her attorney to make a proposition to the administrator to turn over these papers, if there was allowed $1,000 for her services and $500 for services of a sister.

We have stated the facts as claimed by respondents. Some of their testimony she denied.

We do not say that these circumstances would in our minds discredit the testimony of Lena as to what was said and done at the conference of July 28, but we are clearly of the opinion that in view of all these circumstances a trier of facts might reasonably find that there was no intention to create a trust which should authorize the disposal of this property after the death of William and Anna.

Judgment affirmed.